## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**In re:**

**DOUGLAS F. VAUGHAN,**

      **Debtor,**

**YVETTE GONZALES, Trustee**

      **Plaintiff,**

                                      **12 CV 411 JAP/SMV**

**vs.**

**JUDITH A. WAGNER, Trustee of the**
**Bankruptcy Estate of the Vaughan Company Realtors,**
**DAVID H. WOLLEN,**
**RACHEL WOLLEN ADENT, individually,**
**RACHEL WOLLEN ADENT, as Trustee of the Leah Adent**
**and Hannah Adent Trust,**
**JOHN OR JANE DOE, as Trustee of the Julius M. Wollen**
**and Diana Wollen Revocable Trust, and**
**VAUGHAN CAPITAL, LLC,**

      **Defendants**

## MEMORANDUM OPINION AND ORDER

      Defendants David H. Wollen, Rachel Wollen Adent, individually and as trustee of the Leah Adent and Hannah Adent Trust (the Adent Trust), and Julius Wollen, as Trustee of the Julius M. and Diane Wollen Revocable Trust (Wollen Rev. Trust) (together, the Wollen Defendants) ask the Court to grant summary judgment in their favor on the claims asserted by Plaintiff Yvette Gonzales (Gonzales), the Chapter 7 Trustee of the Douglas F. Vaughan

(Vaughan) bankruptcy estate.[1] *See* MOTION FOR SUMMARY JUDGMENT (Doc. No. 21) (Wollen Motion). On June 19, 2013, Gonzales filed a response to the Wollen Motion and a cross-motion for summary judgment asking the Court to grant summary judgment avoiding mortgage liens held by the Wollen Defendants. *See* TRUSTEE YVETTE GONZALES' RESPONSE TO MOTION FOR SUMMARY JUDGMENT AND COUNTER-MOTION FOR SUMMARY JUDGMENT AND  MEMORANDUM OF LAW (Doc. Nos. 34 and 35) (Gonzales Motion).[2]

Gonzales alleges that Vaughan borrowed money from the Wollen Defendants and granted mortgages to the Wollen Defendants secured by certain real property located in Bernalillo County, New Mexico (the Subject Property) in a transaction that was part of a fraudulent "Ponzi" scheme.[3]  Although not the subject of these cross motions, Gonzales also

---

[1]  This case was originally filed in the Bankruptcy Court as an adversary proceeding; however, on November 6, 2012, the bankruptcy reference was withdrawn and the case was assigned to this Court as 12 CV 411 JAP/SMV.  *See* ORDER GRANTING MOTION FOR WITHDRAWAL OF REFERENCE (Doc. No. 11).

[2] On July 19, 2013, the Wollen Defendants filed a REPLY TO TRUSTEE YVETTE GONZALES' RESPONSE TO MOTION FOR SUMMARY JUDGMENT (Doc. No. 45) (Wollen Reply).  On July 22, 2013, the Wollen Defendants filed a RESPONSE TO TRUSTEE GONZALES' CROSS-MOTION FOR SUMMARY JUDGMENT (Doc. No. 47) (Wollen Response).  Briefing is complete on the cross motions. *See* NOTICE OF COMPLETION OF BRIEFING ON: MOTION FOR SUMMARY JUDGMENT FILED BY THE TRUSTEE, YVETTE GONZALES (Doc. No. 50).

[3] *See* COMPLAINT TO RECOVER FRAUDULENT TRANSFERS OR, IN THE ALTERNATIVE, PREFERENCES (Complaint) (Doc. No. 1, Bk. Adv. P. Case No. 12-01143-j). Gonzales has settled her claim against Judith Wagner, Chapter 11 Trustee of the Vaughan Company Realtors bankruptcy.  If Gonzales prevails, Gonzales has agreed to pay one-third of the net proceeds from the sale of the Subject Property, not to exceed $20,000 to Wagner, as trustee for the VCR bankruptcy estate.  The Bankruptcy Court approved this settlement. *See In re Vaughan*, ORDER APPROVING TRUSTEE'S MOTION FOR APPROVAL OF COMPROMISE OF CONTROVERSY BETWEEN YVETTE GONZALES, TRUSTEE OF THE BANKRUPTCY ESTATE OF DOUGLAS F. VAUGHAN, AND JUDITH WAGNER,

2

seeks to avoid Vaughan's transfer of title to the Subject Property to Vaughan Company Realtors

(VCR) and VCR's subsequent transfer of title to the Subject Property to Vaughan Capital, LLC.[4]

In Bankruptcy Court and in District Court, Gonzales and Judith Wagner (Wagner), trustee of the

Chapter 11 bankruptcy estate of VCR, are pursuing numerous claw back cases against investors

who participated in a fraudulent promissory note scheme and who received payments from VCR

in return for their investments.  *See* Case No. 12 CV 817 WJ/SMV (master case).[5]  *See, e.g.,*

*Wagner v. Wilson (In re Vaughan Company Realtors)*, Adv. No. 12-1142 J, 2013 WL 960143,

*1 (Bankr. D.N.M. Mar. 11, 2013) (slip op.) (describing adversary proceedings against parties

who invested in VCR's promissory note program to avoid and recover payments received by

those parties prior to bankruptcy as preferential or fraudulent).

---

TRUSTEE OF THE BANKRUPTCY ESTATE OF VAUGHAN COMPANY REALTORS
(Doc. No. 756) Case No. 10-10763 j7 (Bankr. D. N.M. July 1, 2013). The Court has dismissed
Gonzales' preference claims against the Wollen Defendants. *See* MEMORANDUM OPINION
AND ORDER (Doc. No. 15).

[4] In 2008, Vaughan formed Vaughan Capital, LLC as a New Mexico limited liability
company.  Phoenician Financial Services, LLC (Phoenician), is the sole member of Vaughan
Capital, LLC and Phoenician is wholly-owned by Vaughan.  *See* Case No. 10-10763 11s,
MEMORANDUM OPINION ON U.S. TRUSTEE'S MOTION TO APPOINT CHAPTER 11
TRUSTEE AND MOTION TO CONVERT CASE TO CHAPTER 7 (Doc. No. 343) at 4 n.3
(Bankr. D.N.M. May 20, 2010). On October 20, 2010, the New Mexico Public Regulation
Commission revoked Vaughan Capital, LLC's good standing. (Wollen Mot. Ex. 1 at p. 1.)  The
New Mexico Taxation and Revenue Department sent to Vaughan Capital, LLC a notice of
delinquent property taxes on the Subject Property.  As of July 18, 2013, the property taxes had
not been paid.  (*See* Wollen Resp. Ex. 4 Tammi Williams Aff. ¶¶ 1-2.)

[5] Wagner has filed 161 adversary proceedings against 200 defendants seeking to recover
fraudulent and preferential transfers of property.  *See* JOINT STATUS REPORT AND
PROVISIONAL DISCOVERY PLAN (Doc. No. 1-4.)  Fifty-two of those adversary proceedings
are pending in United States  District Court after orders to withdraw the reference. (*Id.*) In one of
those proceedings, Wagner has sued Julius and Diane Wollen and the Julius M. and Diane
Wollen Revocable Trust seeking return of payments made to them by VCR in return for their
investments.  United States District Judge William P. Johnson is presiding in that case. (Case
No. 12 CV 817 WJ/SMV.)

This case differs from the other claw back cases because Vaughan and VCR made no payments to the Wollen Defendants under the terms of their loans. Instead, Gonzales seeks to avoid the mortgage liens that Vaughan caused VCR to grant the Wollen Defendants as security for the loans from the Wollen Defendants.  The Court concludes that the mortgages are avoidable because Vaughan caused VCR to grant the mortgages to the Wollen Defendants with the intent to defraud his creditors.  However, the Wollen Defendants have shown that they participated in the transaction in good faith and for value.  Therefore, the Court will grant the Wollen Motion and will deny the Gonzales Motion.

I. Introduction

The transaction at issue closed on December 30, 2009, less then two months before Vaughan filed bankruptcy.  At the closing, Vaughan individually purchased the Subject Property using funds loaned by David Wollen and Rachel Wollen Adent, as trustee for the Adent Trust.  Vaughan then transferred the Subject Property to Vaughan Company Realtors (VCR), and Vaughan caused VCR to grant mortgages to David Wollen and Rachel Wollen Adent, as trustee for the Adent Trust.

On February 22, 2010, Vaughan and VCR filed Chapter 11 bankruptcy petitions.  On April 29, 2010, the Bankruptcy Court appointed Wagner as Chapter 11 Trustee of the VCR bankruptcy estate.  In May of 2010, the Bankruptcy Court converted Vaughan's Chapter 11 bankruptcy to Chapter 7, and Gonzales was appointed trustee of Vaughan's Chapter 7 bankruptcy estate.  The Bankruptcy Court found that for several years before the bankruptcy, Vaughan, "a well-known, well-liked, and apparently very successful Albuquerque businessperson," had used VCR to perpetrate "a Ponzi scheme of considerable magnitude and sophistication. . . ."  *See* Case No. 10-10763 11s, MEMORANDUM OPINION ON U.S.

4

TRUSTEE'S MOTION TO APPOINT CHAPTER 11 TRUSTEE AND MOTION TO

CONVERT CASE TO CHAPTER 7 (Doc. No. 343) (Bankr. D.N.M. May 20, 2010) (Starzynski,

B.J.) (Order Converting Case).[6]  On December 21, 2011, Vaughan pleaded guilty to several

counts of wire and mail fraud and is serving a twelve-year prison sentence. *See United States v.*

*Vaughan*, 11 CR 404 BB (D.N.M.).

 II.  Standard of Review: Cross Motions for Summary Judgment

  Summary judgment may be granted if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(a).  Cross motions for summary judgment follow the same procedure.  Each movant must

show the absence of evidence to support the opposing party's claim or defense. *Celotex v.*

*Catrett,* 477 U.S. 317, 325 (1986).  Each party must also support its own position by identifying

portions of the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, which establish the absence of any genuine issue of material

fact. *Universal Money Centers v. AT & T,* 22 F.3d 1527, 1529 (10th Cir. 1994) (citing Fed. R.

Civ. P. 56(c)). The Court may grant summary judgment if the facts supported by admissible

evidence of record show that there is no genuine issue of material fact and the movant is entitled

to judgment as a matter of law. *Id.*  The Court's role in determining whether to grant a motion

for summary judgment is not to weigh evidence and determine the truth of the matter, "but to

---

 [6]  The Wollen Defendants have admitted the existence of the Ponzi scheme for purposes
of this Motion only. (Wollen Mot. Undisp. Facts ¶ 4.)  A "Ponzi" scheme refers to an investment
scheme in which returns to initial investors are not financed through the success of the
underlying business venture, but are taken from principal sums of newly attracted investments.
Typically, investors are promised large returns for their investments.  Initial investors are
actually paid the promised returns, which attract additional investors. *Sender v. Nancy Elizabeth
R. Heggland Family Trust (In re Hedged-Investments Associates, Inc.)*, 48 F.3d 470, 471 n. 2
(10th Cir. 1995) (citations omitted).

determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  In other words, the Court must determine whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.  The Court must not weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  *Underberg v. U.S.*, 362 F. Supp. 2d 1278, 1284 (D. N.M. 2005) (citing *Hunt v. Cromartie*, 526 U.S. 541, 551-52 (1999)).

Rule 56 requires the Court to consider only admissible evidence.  Fed. R. Civ. P. 56(c)(4).  Under this rule, affidavit statements must be treated as if the affiant were testifying at trial, and affidavit statements containing hearsay may not be considered.  *Jacoby v. Akbari–Shahmirzadi* (*In re Akbari-Shahmirzadi*), Bankr. No. 7–11–15351 TL, Adv. No. 12–1021 T, 2013 WL 3230171, *2 (Bankr. D. N.M. June 26, 2013) (citations omitted).  Under Evidence Rule 801, hearsay is an out of court statement made by a declarant "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). However, "'testimony is not hearsay when it is offered to prove only that a statement was made and not the truth of the statement.'" *Skyline Potato Co., Inc. v. Hi–Land Potato Co., Inc.*, No. CIV 10–0698 JB/RHS, 2013 WL 311846, at *19 (D. N.M. Jan. 18, 2013) (quoting *Creaghe v. Iowa  Home Mut. Cas. Co.*, 323 F.2d 981, 984 (10th Cir. 1963)). Statements "offered for the effect on the listener . . . are generally not hearsay." *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1434 (10th Cir. 1993); *see United States v. Smalls*, 605 F.3d 765, 785 n. 18 (10th Cir. 2010).

III.  Background [7]

A.  Julius Wollen's Prior Investments With Vaughan and VCR.

Julius Wollen testified by affidavit about his background, his family,  and his experience investing with Vaughan and VCR.[8]  Julius Wollen is in his 80s, has been retired from his practice of real estate law for 20 years, has been in poor health, and has not participated in commercial dealings since his retirement. (Julius Wollen Aff. Wollen Resp. Ex. 2 ¶¶ 2-3.) David Wollen is Julius Wollen's adult son and is a dentist who practices in New Mexico and Texas. (*Id.* ¶ 4.)  Rachel Wollen Adent is Julius Wollen's adult daughter who has a learning disability, and Julius and  David, "look after her money affairs." (*Id.* ¶ 5.)

In the late 1970s, Vaughan started a  title insurance company called Albuquerque Title Company. (Gonzales Mot. Ex. 6, Julius Wollen Dep. on Written Questions 7:4- 8:7.)  In 1987, Julius Wollen purchased stock in Albuquerque Title, and "the return on his investment varied from 13% to 35% annually, depending on the real estate market cycle." (Julius Wollen Aff. Wollen Resp. Ex. 2  ¶ 10; Julius Wollen Dep. 8:8-12.)  "Eventually, Vaughan sold the company out (it was a great investment) at $50 per share, or slightly more. . . . [Julius Wollen] made a huge amount of money off this sale." (*Id.* 8:15-18.)

In 1993, Julius Wollen (the Wollen Rev. Trust) began making several loans to VCR, which were guaranteed by Vaughan, and secured by a deed of trust.  (Julius Wollen Aff. Wollen

---

[7] The Background section is based on undisputed or uncontroverted facts supported by evidence of record unless otherwise indicated.

[8] Julius Wollen submitted two affidavits, an affidavit dated May 8, 2013 attached as Exhibit 1 to the Wollen Motion and an affidavit dated July 18, 2013 attached as Exhibit 2 to the Wollen Response. The May 8, 2013 affidavit will be identified as "Wollen Mot. Ex. 1," and the July 18, 2013 affidavit will be identified as "Wollen Resp. Ex. 2."

Resp. Ex. 2 ¶ 6.)  The loans were generally short term and carried an interest rate that ranged from 15% to 20%. (*Id.*)  Julius Wollen did not investigate Vaughan's or VCR's creditworthiness. (*Id.*)  From 1993 to 2009, Julius Wollen invested with Vaughan or VCR and received re-payments on loans, or in some cases, agreed to "re-write a note if [he] had the money available." (*Id.*)  Julius Wollen did not know until Vaughan filed bankruptcy that Vaughan "was engaging in this type of transaction with huge numbers of other folks." (*Id.*)  Julius Wollen was under the impression that Vaughan had acquired loans from "a small number of friends and other business associates limited in amount." (*Id.*)  Vaughan represented to Julius Wollen that Vaughan was receiving a small number of loans that would be secured by collateral with a sufficient value to secure the loans. (*Id.*)

Vaughan through VCR made monthly payments to Julius Wollen and the Wollen Rev. Trust on the loans, and those payment were "always made timely until the end of . . . 2009 when there was a late payment." (*Id.* ¶ 6.)  Julius Wollen testified that he called Vaughan about the delinquent payment, and "[Vaughan] led [him] to believe that it was an oversight and payment was immediately made." (*Id.* ¶ 7.) [9] Julius Wollen explained that when he looked at interest rates on what is now referred to as "hard money" loans but what he knew to be private lending, the loans "always had a higher interest rate. [Julius Wollen] was well aware of interest rates charged by GMAC, and they were in the same neighborhood . . . 15 to 20% as [he] recall[s] it, and they had a [sic] higher interest rates." (*Id.* ¶ 8.)

---

[9] Gonzales argues that Julius Wollen's affidavit testimony recounting conversations with Vaughan should be stricken as hearsay.  However, these statements are not offered for the truth of the matter asserted but for the effect that the statements had on Julius Wollen, who offers these statements to explain why he did not foreclose on the deed of trust at that time. Fed. R. Evid. 801(c)(2).

Wagner, who examined VCR's financial records, testified, "Julius Wollen began investing in VCR's promissory note program in 1999, [sic] The Julius Wollens initially invested at a rate of 15% in 1994 and 1995, and periodically rolled or reinvested in notes at a 20% interest rate." (Wagner Aff. Gonzales Mot. Ex. 1 ¶ 9(i).)  From 1993 until the date Vaughan and VCR filed bankruptcy, Julius and Diane Wollen invested a total of at least $960,224.92 in the VCR Note Program. (*Id.*)  During the same time period, Julius and Diane Wollen received payouts of at least $1,389,290.51. (*Id.* ¶ 9(iii).)  "From at least May of 2005 through September 2009, VCR issued monthly payments to [Julius and Diane Wollen] in the amount of $9,290.00." (*Id.* ¶ 9(vi).)

Julius Wollen testified, "[t]he October, 2009 payment was missed.  Because it was an automatic payment made directly into my bank account, I did not notice until November." (Julius Wollen Aff. Wollen Mot. Ex. 1 ¶ 4.)  Upon learning of the missed payment, Julius Wollen sent a demand letter to Vaughan "threatening foreclosure." (*Id.* ¶ 5.)  Julius Wollen testified, "Vaughan replied with profuse apologies and said the non-payment had been a simple glitch that would not be repeated. He promised to make the October and November payments, which he did.  He also made the December payment, . . . ." (*Id.* ¶ 6.) [10]

Wagner's testimony corroborates Julius Wollen's testimony concerning the missed payments, "[o]n or about October 12, 2009, VCR wrote a check for, but failed to make the monthly payment to the [Julius and Diane Wollen] in the amount of $9,292.90. On or about November 11, 2009, VCR also wrote a check for but failed to make the monthly payment to [Julius and Diane Wollen] in the amount of $9,292.90.  VCR's records indicate that on or about

---

[10] Gonzales objects to this testimony as hearsay, but these statements are not submitted for the truth of the matter asserted but to show the effect the statements had on Julius Wollen. Fed. R. Evid. 801(c).

November 30, 3009 [sic], VCR replaced the October and November monthly payments with a single check for $18,585.80.  That check cleared VCR's Operating Account on December 2, 2002 [sic]." (Wagner Aff. Gonzales Mot. Ex. 1 ¶ 10.)[11]

Although this lawsuit does not directly involve Julius Wollen's prior investments, his experience investing with Vaughan and VCR is relevant to understand why Julius Wollen told his son, David Wollen, about Vaughan's loan proposal and encouraged David Wollen to loan to Vaughan his savings and Rachel Wollen Adent's savings held in the Adent Trust.

B.  The December 2009 Transactions.

In the summer of 2009, David Wollen informed his father, Julius Wollen, that David had put his and Rachel Wollen Adent's savings held in the Adent Trust into Certificates of Deposit that were earning so little they were "really not keeping up with inflation." (Julius Wollen Aff. Wollen Resp. Ex. 2 ¶ 13.)  David Wollen asked his father "where he should invest his savings of $150,000 since CD's were paying next to nothing." (Julius Wollen Aff. Wollen Mot. Ex. 1 ¶ 7.) About that time, Vaughan approached Julius Wollen seeking additional money, which Julius Wollen did not have available. (Julius Wollen Aff. Wollen Resp. Ex. 2 ¶ 13.)  The money was to be "a different kind of loan," and with the loaned funds Vaughan was going to "acquire some property in North Albuquerque Acres[.]" (*Id.*)  Julius Wollen understood that the lender would "have a mortgage upon the property." (*Id.*)  Julius Wollen recommended that David Wollen lend to Vaughan both his savings and Rachel Wollen Adent's savings held in the Adent Trust.

---

[11] The Court will assume that both years marked by the Court with "[sic]" were typographical errors and were referring to the year 2009.

      1.  The Wollen Defendants' Knowledge Regarding Value of the Subject Property

Julius Wollen testified about the measures taken to investigate the value of the Subject Property.  Gonzales asks the Court to strike as hearsay Julius Wollen's testimony: "I checked with a Realtor who had a nearby lot for sale. He said it was listed for $219,000 . . . ." (Julius Wollen Aff. Wollen Mot. Ex. 1 ¶ 9.)  Julius Wollen further testified in his second affidavit that he and David Wollen ". . . called a realtor that had a for sale sign on that same street on similar property that he had listed on the same exact listing price."  (Julius Wollen Aff. Wollen Resp. Ex. 2 ¶ 13.)  These statements are hearsay if offered to prove what the Subject Property was worth.  However, the Court will consider the statements for the limited purpose of showing that Julius and David Wollen believed the value of the value of the Subject Property was sufficient collateral for the $175,000 loan.  Julius Wollen's testimony about his conversation with Vaughan concerning the value of the Subject Property is also admissible to indicate what Julius Wollen believed about the value of the Subject Property:

> When I spoke to Vaughan, I told him that I thought his usual real estate was over-subscribed. He said a Mr. Lyman wanted to invest in Vaughan Capital, but the majority of Lyman's funds were tied up in prime vacant residential lot in North Albuquerque Acres. Vaughan told me the land was worth $220,000.

(*Id.* ¶ 8.)  With this testimony, the Wollen Defendants have established that they reasonably believed the Subject Property had a greater value than the amount of money they were loaning to Vaughan.  Gonzales has not presented contradictory evidence as to the value of the Subject Property to show the Wollen Defendants were unreasonable in their belief that the Subject Property was sufficient collateral for the loan.

      2.  Wollen Defendants' Knowledge About Hard Money Lending

David Wollen testified that prior to the December 30, 2009 transaction he was generally

11

aware of private lending arrangements, ". . . sometimes called 'hard money' loans carry a much higher rate of interest than do bank loans and I looked around and was not able to find that the 20% rate that Vaughan was offering was particularly unusual for that type of loan." (David Wollen Aff. Resp. Ex. 3 ¶ 6.)  David Wollen also testified that he ". . . investigated the value of the collateral, and believed, based on my investigations that the value of the collateral to be well in excess of the amount that we were going to loan." (*Id.* ¶ 7.)[12]  Gonzales presented no evidence directly contradicting the Wollen Defendants' evidence concerning "hard money" or private loans.  In addition, Gonzales has not countered the Wollen Defendants' evidence that the value of the Subject Property was greater than the principal amount of the Wollen Defendants' loans.

### 3.  The Closing At U.S. Title

At the December 30, 2009 closing, Thomas Frederick Lyman and Cynthia Lyman (the Lymans), as trustees for the Lyman Family Living Trust dated October 11, 2004, transferred the Subject Property to Vaughan by Warranty Deed. (Gonzales Mot. Ex. 1 at p. 23.) Vaughan then immediately transferred title to the Subject Property to VCR. (Wollen Mot. Ex. 1 Julius Wollen Aff. ¶ 15.)

At the December 30, 2009 closing, David Wollen and Rachel Wollen Adent, as trustee for the Adent Trust, gave Vaughan four checks totaling $175,000: (1) a cashier's check for $51,000 payable to Vaughan; (2) a cashier's check for $81,000 payable to Vaughan and to Vaughan Capital, LLC; (3) a check for $33,000 from Hibiscus Marc Limited Partnership[13]

---

[12]   The Court has considered this testimony as non-hearsay because David Wollen testified about his belief based on what he learned about the Subject Property and did not recite what someone else told him. Fed. R. Evid. 801(c)(2).

[13] Hibiscus Marc Limited Partnership was an LLC that David Wollen had established as an "investment LLC."  (Wollen Reply Ex. 1, David Wollen Aff. ¶ 9.)

payable to Vaughan and signed by David Wollen; and (4) a check from David Wollen, DDS for $10,000 payable to Vaughan. (Wagner Aff. Gonzales Mot. Ex.1 ¶ 11.)  Julius Wollen attended the closing on behalf of Rachel Wollen Adent. (Julius Wollen Aff. Wollen Resp. Ex. 2  ¶ 13.) David Wollen personally invested $150,000, and although it is not evident from the checks themselves, Julius Wollen testified that $25,000 was invested on behalf of Rachel Wollen Adent, as trustee for the Adent Trust.  (Julius Wollen Aff. Wollen Resp. Ex. 2 ¶ 13.) [14]

At the December 30, 2009 closing, David Wollen received a Promissory Note in the amount of $150,000 (the $150,000 Note), and Julius Wollen on behalf of Rachel Wollen Adent, as trustee for the Adent Trust, received a Promissory Note in the amount of $25,000 (the $25,000 Note) (together the Wollen Notes). (Wollen Mot. Ex. 1, Doc. No. 21-1 at pp. 24-32.)  In the Wollen Notes, VCR agreed to pay the principal with interest at the rate of  20% per annum payable in monthly installments until December 1, 2012, the maturity date. (*Id.*) Vaughan signed both notes as Chairman of VCR, and Vaughan signed a personal guaranty of each note. (*Id.*)  To secure the $150,000 Note, Vaughan caused VCR to execute a first mortgage on the Subject Property in favor of David Wollen; and Vaughan caused VCR to execute a second mortgage securing the $25,000 Note on the Subject Property in favor of Rachel Wollen Adent, as trustee of the Adent Trust (together the Wollen Mortgages). (*Id.* Ex. 5.)

At the closing, David Wollen and Vaughan, on behalf of VCR,  executed an

ADDENDUM TO THE PROMISSORY NOTE DATED DECEMBER 30, 2009 BETWEEN

---

[14] Julius Wollen testified, "I believed that I had taken a cashier's check for her $25,000 share directly to Mr. Vaughan at U.S. Title when [sic] the closing. I have found out in looking at the cashier's checks that I must have given this to my son who subsequently got cashier's checks and other checks which were taken to the closing." (Julius Wollen Aff. Wollen Resp. Ex. 2 ¶ 13.)

THE VAUGHAN COMPANY REALTORS AND DAVID H. WOLLEN, AN UNMARRIED

MAN (Wollen Mot. Ex. 1 p. 27).  The document states that David Wollen, as an

"accommodation to The Vaughan Company Realtors," delivered to VCR and to Vaughan "a

cashier's check" in the amount of $150,000 made out to Vaughan Capital, LLC.  In the

"accommodation" document, Vaughan on behalf of VCR stated that VCR, "acknowledges this

debt is [sic] and hereby waives any rights to defenses, objections should there be a default, even

though said check is made out to Vaughan Capital, LLC. It being understood that The Vaughan

Company Realtors are the primary recepients [sic] of The Wollen Loan made hereby." (Mot. Ex.

1 p. 27.)  The same sort of accommodation document was executed by Rachel Wollen Adent for

the Adent Trust. (*Id.* p. 31.)  The December 30, 2009 closing was held at U.S. Title Company.

(Julius Wollen Aff. Wollen Mot. Ex. 1 ¶ 13; David Wollen Aff. ¶ 9 Wollen Resp. Ex. 3.)  U.S.

Title Company issued mortgage title insurance policies covering the Wollen Mortgages. (Wollen

Mot. Ex. 1 pp. 5 - 22.)

On December 31, 2009, Vaughan caused VCR to transfer title to the Subject Property to

Vaughan Capital, LLC. (Julius Wollen Aff. Wollen Mot. Ex. 1 ¶ 15; David Wollen Aff. Wollen

Resp. Ex. 3 ¶ 9.)

C.  Julius Wollen (Wollen Rev. Trust) Purchase Of Wollen Notes And Wollen
Mortgages.

On May 11, 2010, Rachel Wollen Adent assigned her interest in the $25,000 Note and

Mortgage to the Wollen Rev. Trust. (Julius Wollen Aff. Wollen Resp. Ex. 2 ¶ 14.)  On May 28,

2010, David Wollen assigned his interest in the $150,000 Note and Mortgage to the Wollen Rev.

Trust.  Julius Wollen testified that he, as trustee of the Wollen Rev. Trust, purchased the

assignments from David Wollen and Rachel Wollen Adent because he "felt horribly bad that I

had told them about this transaction, and I believed that I would better be able to deal with what I assumed had to be foreclosure on a local Albuquerque mortgage in order to obtain return of the loan funds." (*Id.*)

D.  Hard Money Loans

The Wollen Defendants submitted the affidavit of Brian E. Rowe, CPA, as an expert, and Mr. Rowe testified about private asset-based financing or "hard money loans."  (Wollen Reply Ex. 1 Rowe Aff. and Curriculum Vitae.)  Mr. Rowe testified "there is a market for private lending arrangements . . . referred to as 'hard money' loans or 'commercial hard money' lending." (*Id.* ¶ 4.)  With these loans, the borrower quickly receives funds, and the loan is secured by a parcel of real estate or other assets without the administrative "red tape" such as credit checks and financial analysis that is typical with bank loans. (*Id.*)  Due to the higher level of risk, the interest rates on "hard money loans" are higher than on conventional loans. (*Id.*) Lenders rely primarily on the value of the collateral securing the loan to ameliorate the risk. (*Id.*) Hard money loans carry a higher interest rate than sub-prime real estate loans, and "can easily be for about 11.5%, plus five (5) points even on a residential mortgage." (*Id.* ¶ 5.)  According to Mr. Rowe, the interest rate on hard money loans is driven by the condition of the real estate market and the availability of credit. (*Id.*)  According to Mr. Rowe, from 1998 to 2010, hard money loans yielded interest rates from 12% to 21%. (*Id.*)  Mr. Rowe testified that with respect to the loan from the Wollen Defendants, the rate of 20% "would not be unusual or unexpected" and the loan "would not have been indicative of a transaction that was a Ponzi scheme in this market for this type of loan." (*Id.* ¶ 7.)

Although Gonzales offered the affidavit of Judith A. Wagner reciting her qualifications as a "certified public accountant (CPA) . . . specializing in forensic and valuation services"

holding a designation by "the American Institute of Certified Public Accountants (AICPA)" as "Certified in Financial Forensics" and as "Accredited in Business Valuation (ABV)" (Wagner Aff. ¶¶ 2-3), Wagner's testimony does not contradict Rowe's affidavit testimony about hard money loans.  In her affidavit Wagner recounts the investments by Julius Wollen (Wollen Rev. Trust) in VCR and the payments from VCR to the Wollen Rev. Trust.  Wagner also describes four checks totaling $175,000 deposited into the Vaughan Capital, LLC account on December 30, 2009.  However, in her affidavit Wagner nowhere testifies that the interest rates VCR paid the Wollen Rev. Trust over many years were unusual or unexpected or that the rates on these loans would have indicated to Julius Wollen that this transaction was part of a Ponzi scheme.

In addition, Plaintiff Gonzales did not dispute Mr. Rowe's qualifications to express opinions (1) about hard money loans or (2) that the Wollen Rev. Trust loans would not have indicated an underlying Ponzi scheme.  Nor has Plaintiff Gonzales challenged under Fed. R. Evid. 703 the bases for Mr. Rowe's opinions.  Because Gonzales presented no evidence contradicting Mr. Rowe's testimony about hard money loans, the Court can accept as undisputed the general information about these types of loans as set forth in Mr. Rowe's affidavit.

IV.  Discussion

A.  Bankruptcy Law On Fraudulent Transfers.

Gonzales contends that the Wollen Defendants' receipt of the Wollen Mortgages in the December 30, 2009 transaction are avoidable under 11 U.S.C. § 548 (a)(1)(A) because they

"occurred as part of a Ponzi scheme, . . . with intent to defraud creditors."  (*Id.* ¶ 18.)[15]

Section 548 of the Bankruptcy Code provides in relevant part,

> (a)(1) The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily–
>
> > (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or the date that such transfer was made or such obligation was incurred, indebted.

Section 548(c) provides an affirmative defense to a fraudulent transfer:

> (c) . . . a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.
> . . .
> > (A) "value" means property, or satisfaction or securing of a present or antecedent debt of the debtor[.]

11 U.S.C. § 548(a)-(c).

In determining whether to avoid a transfer of property under § 548(a)(1)(A), the focus is

---

[15] Although the briefs on the cross motions for summary judgment address claims of constructive fraud against the Wollen Defendants, the Complaint does not specifically ask the Court to avoid the Wollen Mortgages under the constructive fraud provision of § 548(a)(1)(B). In ¶ 17 of the Complaint, Gonzales asserts a separate claim  to avoid the transfers of the Subject Property to VCR and to Vaughan Capital, LLC under both the actual fraud and the constructive fraud provisions of the Bankruptcy Code.  However, with respect to Gonzales' claim against the Wollen Defendants, Gonzales alleges that "the transfers of the mortgages in the Subject Property from VCR to David Wollen and Rachel Wollen Adent occurred as part of a Ponzi scheme, and the transfers were made with the actual intent to defraud creditors." (Compl. ¶ 18.)  Hence, the Court will rule on the cross motions for summary judgment only as the arguments and authorities apply to Gonzales' actual fraud allegations.  The Court notes that even if the Complaint alleged constructive fraud with respect to the Wollen Mortgages, the claim would be dismissed because the good faith defense in § 548(c) applies to both actual and constructive fraud.

on the fraudulent intent of the transferor, the debtor, rather than the transferee. *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Technologies Ltd.)*, 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005).  When the evidence shows that the transferor was perpetrating a Ponzi scheme, "actual intent to defraud" can be established with the "Ponzi scheme presumption." *See, e.g., Perkins v. Haines*, 661 F.3d 623, 626 (11th Cir. 2011) ("With respect to Ponzi schemes, transfers made in furtherance of the scheme are presumed to have been made with the intent to defraud . . . .") (citations omitted).  In the context of a Ponzi scheme, "[t]he fraud consists of funneling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment." *Wagner v. Pruett (In re Vaughan Company Realtors)*, 477 B.R. 206, 219 (Bankr. D. N.M. 2012) (quoting *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 590 n. 1 (9th Cir. 1991)).  In other words, it is presumed that "any transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay, or defraud creditors." *McHale v. Boulder Capital LLC (In re The 1031 Tax Group, LLC)*, 439 B.R. 47, 72 (Bankr. S.D.N.Y. 2010) (citations omitted).  To take advantage of the Ponzi scheme presumption, the trustee must establish that: (1) investments were made by investors; (2) the debtor conducted little or no legitimate business operations as represented to investors; (3) the purported business operations of the debtor produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors. *Kapila v. Phillips Buick–Pontiac–GMC Truck, Inc. (In re ATM Financial Svcs, LLC)*, 6:08–bk–969–KSJ, 6:10–ap–44, 2011 WL 2580763, *4 (M.D. Fla. June 24, 2011) (unpublished decision) (citing *Wiand v. Waxenberg*, 611 F. Supp. 2d 1299, 1312 (M.D. Fla.2009)).

  The Ponzi scheme presumption has been considered in cases seeking avoidance of pre-

petition payments made to investors who participated in VCR's promissory note program. *See Wagner v. Oliva et al. (In re Vaughan Company Realtors)*, Misc. 12-0006-j, MEMORANDUM OPINION, Doc. No. 74 (Oct. 23, 2013) (slip. op.), *Pruett,* 477 B.R. at 218; *Wagner v. Wilson (In re Vaughan Company Realtors)*, Bankr. No. 10-10759, Adv. Proc. 12-1142, 2013 WL 960143, *7 (Bankr. D.N.M. Mar. 11, 2013) (slip op); and *Wagner v. Cunningham (In re Vaughan Company Realtors)*, 481 B.R. 752, 760-61 (Bankr. D. N.M. 2012). Although the Ponzi scheme presumption is available to establish an intent to defraud, the Court must determine whether the transaction was connected to Vaughan's Ponzi scheme. *Pruett*, 477 B.R. at 220-221.

   B. Was The December 30, 2009 Transaction Part Of Vaughan's Ponzi Scheme?

   The Wollen Defendants assert that this transaction was not part of Vaughan's Ponzi scheme; therefore, the presumption should not apply to establish Vaughan's fraudulent intent. They contend that their transaction was a discreet purchase of one parcel of real property financed by David Wollen and Rachel Wollen Adent, both of whom had never previously invested with Vaughan. The Court concludes that the evidence supports a finding that Vaughan participated in this transaction as part of his overall Ponzi scheme. But, even if the transaction was not technically part of Vaughan's Ponzi scheme, Vaughan caused VCR to grant the Wollen Mortgages with actual intent to defraud his creditors.[16]

_____

[16] The Court notes that Vaughan's use of VCR to perpetrate his fraud is not disputed. Gonzales, as representative of the Vaughan bankruptcy estate, seeks to avoid all transfers of title to the Subject Property, and the liens on the Subject Property, in order to recover title to the Subject Property for Vaughan's bankruptcy estate. However, it was VCR, not Vaughan, that actually granted the mortgages to David Wollen and Rachel Wollen Adent, for the Adent Trust. In this ruling, the Court considers Vaughan as having the primary role in the transaction, and the Court has treated VCR as merely a conduit through which Vaughan perpetrated his fraud. Presumably, Gonzales' settlement with Wagner resolves concerns by VCR's creditors about its

As described by the Bankruptcy Court, Vaughan operated the fraudulent promissory note program:

> VCR issued promissory notes to investors with high, fixed rates of return that were allegedly secured by a deed of trust on real property, other investments, and Mr. Vaughan's personal wealth, but that, in fact the money received from investors "was not utilized to buy real estate or to further real estate projects as purported, but instead was primarily used to make principal and/or interest payments to other investors and to fund VCR's operating expenses . . . and to enrich [Mr.] Vaughan.

*Pruett*, 477 B.R. at 220 (describing allegations of complaint as a "textbook example of a Ponzi scheme.").  In his criminal plea agreement, Vaughan described his elaborate Ponzi scheme. *See United States v. Vaughan*, 11 CR 404 BB (Doc. No. 125) (Gonzales Mot. Ex. 2).  Vaughan's

---

interest in the Subject Property.

plea agreement admissions are admissible under Evidence Rules 803(22)[17] and 807.[18] *See Rosen v. Neilson (In re Slatkin)*, 310 B.R.740, 744-45 (C.D. Cal. 2004).  Vaughan described the overall structure of the VCR promissory note program and his formation of Vaughan Capital, LLC in furtherance of the fraudulent scheme:

---

[17] Fed. R. Evid. 803 (22) provides that certain statements are not excluded as hearsay:

(22) Judgment of a Previous Conviction. Evidence of a final judgment of conviction if:

>(A) the judgment was entered after a trial or guilty plea, but not a nolo contendere plea;

>(B) the conviction was for a crime punishable by death or by imprisonment for more than a year;

>(C) the evidence is admitted to prove any fact essential to the judgment; and

>(D) when offered by the prosecutor in a criminal case for a purpose other than impeachment, the judgment was against the defendant.

The pendency of an appeal may be shown but does not affect admissibility.

[18] Fed. R. Evid. 807(a) states,

(a) In General. Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804:

>(1) the statement has equivalent circumstantial guarantees of trustworthiness;

>(2) it is offered as evidence of a material fact;

>(3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

>(4) admitting it will best serve the purposes of these rules and the interests of justice.

<u>The Vaughan Company, Realtors</u>

. . . In or about 1993, I began an investment program in which I accepted money on behalf of VCR from investors in exchange for interest-bearing promissory notes. . . .

The term of the notes varied but was typically three years and the interest rate ranged from as low as approximately 8% to as high as 40% per year.  The notes typically provided that interest was to be paid in monthly installments. . . .

The promissory notes contained the following language purporting to limit the size of the promissory note program: "This note is one of an issue of Promissory Notes in the aggregate principal amount not to exceed [a sum certain of money] and issued in various denominations, interest rates, and maturities." . . . Anther provision of the promissory note reiterated that "[t]his Note is part of an issue the aggregate amount of which shall not exceed [the sum certain identified in the earlier paragraph]."

The promissory notes also provided that "[t]his Note and all Notes of this issue are secured by a Deed of Trust to [Name of Trustee]."  I pledged to this trust certain bank accounts, stock holdings, and pieces of real property that I owned in my personal capacity.

In addition to VCR's corporate promise to repay investors and the properties pledged to the Deed of Trust, the promissory notes also purportedly were collateralized by a "Personal Guarantee" that I signed and gave to each investor. . . .

I caused to be distributed to proposed investors an "Executive Summary" explaining the promissory note program and how the invested funds would be used.  The language in the Executive Summary varied little over the years and I continued to distribute them until near the date on which I and VCR filed for bankruptcy protection. . . .

In contrast to the representations in the Executive Summary, I used the proceeds from the promissory note program primarily for three undisclosed purposes: (a) to pay the interest and principal on promissory notes taken out by earlier investors; (b) to pay myself, either as salary, bonuses, or other personal transfers; and (c) to subsidize the corporate operations of VCR, which was generating insufficient "legitimate" real estate-related revenue to sustain itself.

In addition to distributing the Executive Summaries, I also caused promissory noteholders to receive newsletters along with their monthly interest checks.  These newsletters, which I prepared personally, often were accompanied by positive news articles regarding the real estate market in Albuquerque. . . .

In the last three or four months of 2009 and the first two months of 2010, I personally decided which investors got paid and when they were paid.

I used the VCR operating account to manage the flow of money into and out of the promissory note program. All investments were deposited into the operating account, where they were commingled with real estate commissions and other sources of VCR revenue. Similarly, I caused all interest and principal payments on the promissory notes to be made from that account. . . .

On or about February 22, 2010, I filed for personal and corporate bankruptcy protection. At that time, the aggregate principal balance that VCR and I owed to approximately 600 noteholders was approximately $74,745,723.93. . . .

Vaughan Capital, LLC

On or about June 20, 2008, I formed another investment company called Vaughan Capital, LLC (hereinafter VC). The sole "Initial Member of the Company" was Phoenician Financial Services, LLC, of which I was the sole owner. I caused to be prepared a Confidential Private Placement Memorandum ("Memorandum") for prospective VC investors. The Memorandum described me as the "Manager" of the Company and further stated that VC would be limited to a maximum of 24 investors and that its aggregate offering price was $10,000,000.00.

The Memorandum set forth a "business concept" for VC that began "[i]n the context of today's financial markets, a business opportunity has been identified for equity capital. The Company is being formed for the purpose of raising capital and investing in these opportunities." The business concept then went on to identify five investment "opportunities" that are described in pertinent part as follows:

1. *Investment in Distressed Properties.* . . .
2. *Loan Portfolios.* . . .
3. *Loans.* . . .
4. *Bridge Loans.* . . .
5. *Mezzanine Financing.* . . .

Between on or about December 5, 2008 and on or about January 8, 2010, the other Vaughan Capital investors (not including me) invested a total of approximately $6,187,501.57 into VC. . . .

An analysis of the VC account showed [that]. . . between December 5, 2008, and February 26, 2010 . . . $6,232,092.74 was transferred to VCR's operating account, a substantial portion of which was transferred to VCR promissory note investors. A total of $713,459.58 was transferred back to VC.

I directed the transfers from VC to VCR, which began almost immediately after the first person other than me invested in VC. In my role as chairman of VCR, I signed promissory notes in which VCR promised to repay VC. . . . Then, in my role as the Manager of VC, I agreed to these terms on behalf of VC. In sum and substance,

therefore, I was dealing only with myself in authorizing and accepting these transfers from VC to VCR. . . .

I directed that money be loaned from VC to VCR on approximately 65 occasions.  With the exception of two transfers of less than $100, the amounts transferred ranged from $14,000.00 to $250,000.00. . . .

By the time I filed for personal and corporate bankruptcy, the almost $7 million of initial capital in VC had shrunk to two residential properties in or near Las Vegas, Nevada, with an approximate total value of less than $350,000.00, and the remaining balance in VC's bank account of $5,648.61.

(Gonzales Mot. Ex. 2 PLEA AGREEMENT ADDENDUM (Admission of Facts) pp. 1- 12.)

Vaughan further admitted that he used Vaughan Capital, LLC's capital to repay VCR's

investors, as a temporary measure "forestalling the collapse of the promissory note program[.]"

(*Id.* at p. 12.)

Gonzales maintains that this transaction was part of Vaughan's fraudulent scheme

pointing to the similarities between this loan transaction and the promissory note program: (1)

the Wollen Notes were issued by VCR; (2) VCR promised a high, fixed rate of return (20%); (3)

VCR was required to pay monthly installment payments; (4) the Wollen Notes had a three-year

maturity; (5) they were secured by real property; and (6) they were personally guaranteed by

Vaughan.  Gonzales further contends that Vaughan's insertion of Vaughan Capital, LLC into the

transaction supports an inference that this transaction was in furtherance of Vaughan's Ponzi

scheme.  Gonzales points to Julius Wollen's testimony in which he admitted he knew that the

Lyman's wanted to invest in Vaughan Capital, LLC as further support for this inference.

However, the Wollen Defendants identify several differences between this transaction

and the investment structure of the promissory note program that they claim are sufficient to

negate the Ponzi scheme presumption.  First, the Wollen Notes were not part of an "issue of

Promissory Notes in the aggregate principal amount" and they were not "issued in various

denominations, interest rates, and maturities." (Gonzales Mot. Ex. 2 PLEA AGREEMENT

ADDENDUM (Admission of Facts) at p. 1.)  The Wollen Notes were not "secured by a Deed of

Trust." (*Id.*)  The Wollen Notes were not further secured by "bank accounts, stock holdings, and

pieces of real property that [Vaughan] owned in [his] personal capacity." (*Id.*) Vaughan did not

provide an Executive Summary to David Wollen and Rachel Wollen Adent, which Vaughan

issued to all proposed investors in the promissory note program. (*Id.* at p. 2.)  There is also no

evidence that David Wollen and Rachel Wollen Adent received a monthly newsletter that

Vaughan sent to promissory note program participants.  (*Id.*)

Despite the different form of this transaction compared to Vaughan's promissory note

investment scheme, it can reasonably be inferred that this transaction was part of Vaughan's

fraudulent scheme.  Hence, the Court may apply the Ponzi scheme presumption and find that

Vaughan received the Wollen Defendants' money and had VCR grant the Wollen Mortgages

with the intent to defraud his creditors. The evidence shows that Vaughan approached Julius

Wollen and asked him for an additional "investment of money," but Julius Wollen declined.

Instead, because Julius Wollen suspected Vaughan's usual collateral was over-subscribed**,** Julius

Wollen recommended that his children loan their savings to Vaughan in a separate secured

transaction to purchase the Subject Property.  Furthermore, a fair assumption can be made that

instead of directly paying the Lymans for the Subject Property, Vaughan used the money loaned

by the Wollen Defendants to pay other investors and thereby forestall the inevitable demise of

his Ponzi scheme.  In his plea admissions, Vaughan stated that in the three months prior to his

bankruptcy filing, he alone decided which of his "investors" to pay.  Vaughan deposited the

funds loaned by the Wollen Defendants into the Vaughan Capital, LLC operating account even

though three of the checks were payable only to Vaughan personally.  Vaughan had the Wollen

25

Defendants execute addendums to the loan documents, which contained the false representation that all of the checks tendered at closing were payable to Vaughan Capital, LLC and that VCR was the primary recipient of the loaned funds.  The day after the closing, unbeknownst to the Wollen Defendants, Vaughan transferred title to the Subject Property to Vaughan Capital, LLC. However, later Vaughan caused Vaughan Capital, LLC to transfer an amount of money to VCR that was equivalent to the amount loaned by the Wollen Defendants.  According to his plea admission, Vaughan made similar transfers quite often through inter-company "loans." In view of this evidence, the Court concludes that Vaughan entered into this transaction with actual intent to defraud his creditors.

C. Are The Wollen Defendants Protected By The Good Faith Defense?

1.  Legal Standard For Good Faith

Section 548(c) provides a "safe harbor to transferees who received an otherwise avoidable transfer in good faith and for value." *Wagner v. Wilson (In re Vaughan Co. Realtors)*, 2013 WL 960143, * 9.  Section 548(c) provides that ". . . a transferee . . . that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, . . . to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation."  11 U.S.C. § 548(c).  Section 548(c) provides an affirmative defense to a fraudulent transfer claim, and the defendant has the burden to prove that he gave value and engaged in the transaction in good faith.  *Jobin v. McKay (In re M & L Business Mach. Co., Inc.)*, 155 B.R. 531, 534 (Bankr. D. Colo. 1993) (referring to Section 548(c) as an affirmative defense).

The Bankruptcy Code does not define good faith.  However, the Tenth Circuit has held that "good faith under § 548(c) should be measured objectively." *Jobin v. McKay (In re M & L*

*Business Mach. Co., Inc.)*, 84 F.3d 1330, 1338 (10th Cir. 1996) (noting that good faith includes an objective component, which includes an honest belief and also freedom from knowledge of circumstances which ought to put the holder on inquiry).  Using a two-part inquiry, the Court must determine whether the "circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose," and if so, whether "a diligent inquiry would have discovered the fraudulent purpose."  *Id*.

In applying the "reasonable person" standard, courts take into account the transferees' individual circumstances, including their sophistication as investors and whether they had actual knowledge of the transferor's fraud or insolvency.  *See In re M & L Business Mach. Co,* 84 F.3d at 1338-39 (affirming the bankruptcy court's application of the standard to a "reasonably prudent investor in [the transferee's] position."). Courts examine one or more factors: (1) the transferee's state of mind, including whether he or she had actual or inquiry knowledge of the fraudulent scheme; (2) whether the investor received exorbitant returns and/or was promised an interest rate greatly exceeding any standard market rates; (3) how the investor was enticed to make the investment, including how the investment was marketed; (4) whether the transfers occurred at arm's length, and more specifically, how the investor became aware of or affiliated with the debtor; (5) the individual investor's education and sophistication; (6) the size of the investment; (7) any prior business dealings between the transferor and transferee, including whether a payment was late or made by any unusual method; and (8) whether there existed any other red flags that the investment may not be legitimate.  *See, e.g., Christian Bros. High School Endowment v. Bayou No Leverage Fund (In re Bayou Grp., LLC),* 439 B.R. 284, 314 (S.D.N.Y. 2010) (noting that courts must examine whether investors had knowledge of any red flags that put investors on inquiry notice); *Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.),*

310 F.3d 796, 800-801 (5th Cir. 2002) (determining that the good faith defense applied where

investors were unaffiliated with the debtor and negotiated an arm's length transaction); *In re*

*M&L Business Mach. Co., Inc.,* 84 F.3d at 1338 (affirming bankruptcy court's finding that the

transferee did not act in good faith where the debtor used postdated checks to pay transferee); *In*

*re M & L Bus. Mach. Co., Inc.,* 160 B.R. 850, 859 (D. Colo. 1993) (affirming bankruptcy court's

conclusion that Ponzi-scheme investor did not act in good faith by engaging in a risk-free

investment producing profits up to 512%); *Hayes v. Palm Seedlings Partners-A (In re Ag.  Res.*

*and Tech. Gp, Inc.)*, 916 F.2d 528, 539 (9th Cir. 1990) (ruling that investor did not act in good

faith where the value received was grossly in excess of the initial investment); and *CEP*

*Holdings, Inc. v. Schreier (In re CEP Holdings, Inc.),* Bankr. Nos. 07–71810, 07–71813, Adv.

Proc. 07–6428, 2010 WL 2036949, *6 (Bankr. N. D. Ga. 2010) (rejecting the good faith defense

where defendants received extraordinary profits on relatively small investments).  Certain factors

may be given more or less weight depending on the circumstances.

### 2.  The Wollen Defendants Gave Value

Under § 548(c), the recipient of a fraudulently transferred mortgage lien, which is

otherwise avoidable under § 548(a), may retain the lien to the extent that the recipient gave value

to the debtor in exchange for the lien.  *See Doeling v. Grueneich (In re Grueneich)*, 400 B.R.

688, 695 (B.A.P. 8th Cir. 2009) (holding that mortgage refinance provided value to the debtors).

In this transaction, the Wollen Defendants gave Vaughan cashier's checks in the amount of

$175,000 and in exchange received the Wollen Notes and the Wollen Mortgages on the Subject

Property.  Under the Code definition of "value," the Wollen Defendants are entitled to exercise

their rights under § 548(c) up to the amount of the value given, $175,000.  *See Stalnaker v.*

*Gratton (In re Rosen Auto Leasing, Inc.)*, 346 B.R. 798, 805 (B.A.P. 8th Cir. 2006) (rejecting

fraudulent transfer claim and concluding that defendant who cancelled a promissory note from debtor in exchange for debtor's check in payment for that debt gave value equal to the amount of the check).

Gonzales contends that because the checks tendered at the closing were payable to Vaughan and/or Vaughan Capital, LLC, the Wollen Defendants did not give value to VCR, which is the entity from which they received the Wollen Mortgages. Moreover, Gonzales maintains that VCR did not receive the funds tendered at closing because Vaughan deposited the checks into Vaughan Capital, LLC's bank account. In response, the Wollen Defendants argue that they had no control over where the money was deposited, and Gonzales has no standing to argue that VCR did not receive "value" because Gonzales is the trustee of Vaughan's, not VCR's, bankruptcy estate. However, the focus of this inquiry is not on Gonzales' standing, but on whether and to what extent Vaughan received value at the time of closing. *Clark v. Security Pacific Business Credit, Inc. (In re Wes Dor, Inc.)*, 996 F.2d  237, 242 (10th Cir. 1993) (holding that "value" under § 548(c) is determined by the amount of valuable consideration given to the debtor at the time of the transaction); *see also Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 800 (5th Cir. 2002) (holding that under § 548(c) value of investment options that fraudulent transfer defendant provided in exchange for cash payments from debtor "had to be judged as of time of challenged payments, not in retrospect.").

The evidence shows that the Wollen Defendants gave Vaughan cashier's checks payable to Vaughan and/or Vaughan Capital, LLC in exchange for the Wollen Mortgages on the Subject Property. At that time, Vaughan received value equal to the amount of the checks, $175,000, and with this value, Vaughan was able to purchase the Subject Property from the Lymans, transfer the Subject Property to VCR, and cause VCR to grant mortgage liens to the Wollen

Defendants.  Vaughan's later deposit of the funds into the Vaughan Capital, LLC account without the Wollen Defendants' knowledge does not change this conclusion.  Moreover, Vaughan's later transfer of the Subject Property to Vaughan Capital, LLC does not affect this analysis.[19]  *See Merrill v. Abbott (In re Independent Clearing House Co.)*, 77 B.R. 843, 857 (Bankr. D. Utah 1987) (stating that investor in Ponzi scheme gives value up to the amount of his principal investment).

 *Stalnaker v. Gratton (In re Rosen Auto Leasing, Inc.)* is instructive.  In that case, both Jerome Rosen and his closely held corporation, Rosen Auto Leasing, Inc., were in Chapter 7 bankruptcy proceedings. 346 B.R. at 802.  Mr. Rosen had personally guaranteed the corporation's debt to creditor George Gratton. *Id.* at 801.  Prior to both bankruptcy filings, Mr. Rosen granted a mortgage on his residence to secure the guaranty. *Id.*  The Eighth Circuit Bankruptcy Appellate Panel upheld a finding by the Bankruptcy Court that the mortgage was avoidable under § 548 and that Mr. Gratton was not protected by § 548(c) because Mr. Gratton did not give value for the mortgage lien:

> Prior to the transaction, Mr. Rosen was indebted to Mr. Gratton pursuant to an unsecured guaranty and owned his condominium free and clear. After the transaction, Mr. Rosen was indebted to Mr. Gratton pursuant to the Personal Note and his condominium was subject to a lien securing the indebtedness. Mr. Gratton went from an unsecured creditor to a secured creditor and gave nothing in return. He therefore did not give value in exchange for the lien.

 *Id.* at 805-06.

---

[19] Even so, the Wollen Defendants presented evidence that, in January 2010, a few days after the December 30, 2009 closing, Vaughan caused Vaughan Capital, LLC to transfer an equivalent amount of money to VCR. (*See* Wollen Resp. Ex. 5 e-mail from Gonzales' counsel to Wollen's counsel pointing to records showing a transfer from Vaughan Capital, LLC to VCR). Therefore, VCR appears to have received value for its grant of the mortgages.

Here, in contrast, Vaughan borrowed money and granted the Wollen Mortgages all in the same transaction.  Vaughan borrowed $175,000 from the Wollen Defendants, purchased the Subject Property, and transferred it to VCR, then caused VCR to grant mortgages to the Wollen Defendants. The Wollen Defendants gave value in the amount of $175,000 in exchange for the Wollen Mortgages, and if the Wollen Defendants prove they acted in good faith, they retain their rights up to the amount of value given, $175,000.

### 3. The Wollen Defendants Established Good Faith

A common thread in the good faith analysis is whether, under the circumstances surrounding the transaction, the transferee should have been on notice that the transaction was not legitimate or that more inquiry was necessary.  In this case, the Court focuses on the time of the transaction; subsequent events are largely irrelevant. *In re Wes Door, Inc*., 996 F.2d at 242. Here, the Court will look primarily to Julius Wollen's ability to discern whether this transaction was fraudulent because he recommended this loan transaction to David Wollen, and David Wollen admitted he relied heavily on his father's advice.  Moreover, Julius Wollen attended the closing on behalf of his daughter  Rachel Wollen Adent.  Based on their relationship and the record evidence, David and Rachel Wollen's good faith is tied to Julius Wollen's knowledge and experience.  Hence, in any general discussion of the Wollen Defendants' knowledge the Court concentrates on evidence related to Julius Wollen's knowledge and experience.

The Wollen Defendants point to uncontroverted evidence that supports a finding of good faith: (1) over a number of years Julius Wollen and the Wollen Rev. Trust successfully invested in Albuquerque Title Company and also received a large return on money invested  in Vaughan's promissory note program; (2) based on this success, Julius Wollen advised his children to loan money to Vaughan; (3) the Subject Property used to secure the Wollen Notes

31

was valued at more than the loan amount; and (4) the short term of the loan, the high interest rate, the lack of investigation into Vaughan's financial health, and the reliance on valuable collateral were not unusual for a private "hard money" loan transaction.  Gonzales points to other matters that, she claims, should have caused the Wollen Defendants to inquire further into the legitimacy of the transaction and into Vaughan's financial health: (1) the 20% rate of return was much higher than the typical residential or commercial loan; (2) Julius Wollen was an experienced investor who should have known that the loan transaction was "too good to be true;" (3) Julius Wollen failed to investigate Vaughan's and VCR's financial health during the several years he invested in the promissory note program; (4) in late 2009, Julius Wollen unreasonably trusted Vaughan's explanation when two payments to the Wollen Rev. Trust were missed; (5) Julius Wollen admitted that in late 2009 he had reason to suspect that Vaughan's "usual real estate was over-subscribed;" and (6) Julius Wollen unreasonably relied on Vaughan's word, "his integrity, his reputation in the community" and had no information related to Vaughan's or VCR's ability to pay back the loan.  Finally, Gonzales asserts that as early as 2008 Julius Wollen should have suspected that Vaughan was using VCR to perpetrate a Ponzi scheme because during that year, Bernard Madoff was arrested and the Securities and Exchange Commission disseminated information about Ponzi schemes to the public. However, Gonzales fails to show that the Wollen Defendants were aware of information about Bernard Madoff's scheme or whether it was similar enough to Vaughan's scheme to cause Julius Wollen to suspect the legitimacy of this transaction.

In light of Julius Wollen's successful investment with Vaughan over several years and in light of the valuable and separate collateral used to secure their purchase-money loan, the Wollen Defendants have shown as a matter of undisputed fact that they participated in this

transaction in good faith.  Gonzales' argument that this loan transaction was too good to be true was not supported with evidence.  The Wollen Defendants presented the uncontradicted testimony of Brian Rowe, CPA that a 20% interest rate is not unusual for private asset-based financing.  Although the rate of return was much higher than returns on CD's, which did not "keep up with inflation," Mr. Rowe's testimony demonstrates that the terms of this loan were reasonable in exchange for the heightened risk associated with private asset-based lending.  Julius Wollen's positive and lucrative experience with Vaughan coupled with Julius Wollen's general knowledge about private lending shows that the Wollen Defendants reasonably relied on Vaughan's track record even without specific information about Vaughan's financial situation.  Most significantly, the Wollen Notes were fully secured, and in private asset-based lending, the value of the collateral is more important to a lender than the creditworthiness of the obligee.

In conclusion, the evidence shows that Vaughan entered into this transaction and caused VCR to grant the Wollen Mortgages in a scheme designed to defraud his creditors.  However, the uncontroverted evidence shows the Wollen Defendants loaned money to Vaughan in good faith and for value.  Therefore, the Wollen Defendants "may retain" their right to enforce the Wollen Notes and the Wollen Mortgages under § 548 (c), to the extent of the $175,000 in value given in this transaction.

IT IS ORDERED that

1.  The MOTION FOR SUMMARY JUDGMENT (Doc. No. 21) is granted;

2.  TRUSTEE YVETTE GONZALES' RESPONSE TO MOTION FOR SUMMARY JUDGMENT AND COUNTER-MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW (Doc. Nos. 34 and 35) is denied; and

3.  Plaintiff Gonzales' claims against Defendants David H. Wollen, Rachel Wollen

Adent, individually and as trustee of the Leah Adent and Hannah Adent Trust, and Julius

Wollen, as Trustee of the Julius M. and Diane Wollen Revocable Trust will be dismissed.

A separate summary judgment will be entered.

_____

SENIOR UNITED STATES DISTRICT JUDGE